763 P.2d 1003 (1988)
BELLE BONFILS MEMORIAL BLOOD CENTER, Petitioner,
v.
The DISTRICT COURT In and For the CITY AND COUNTY OF DENVER; The Honorable J. Stephen Phillips, one of the Judges thereof; and C.W. and K.W. individually and as next best friend of their son, R.W., Respondents.
No. 88SA45.
Supreme Court of Colorado, En Banc.
October 17, 1988.
As Modified on Denial of Rehearing November 28, 1988.
*1004 Breit, Best, Richman, and Bosch, P.C., John L. Breit, Susan Smith Fisher, Denver, for petitioner.
Peter Smith & Susan Young Law Offices, P.C. Peter M. Smith, Lakewood, for respondents C.W. and K.W.
Arnold & Porter, James J. Sandman, Bruce M. Chadwick, Denver, for amici curiae American Nat. Red Cross, American Ass'n of Blood Banks and Council of Community Blood Centers.
Thomas L. Roberts, JoAnne M. Zboyan, Englewood, for amicus curiae Colorado Hosp. Assn.
ERICKSON, Justice.
The petitioner, Belle Bonfils Memorial Blood Center, pursuant to C.A.R. 21, filed a petition to obtain a rule to show cause why the identities of volunteer blood donors, whose blood was transfused the respondent, K.W., should not be held confidential and privileged from discovery. We issued a rule to show cause and now make the rule absolute in part and discharge the rule in part.

I.
On February 28, 1985, K.W. gave birth to a son, R.W., at Mercy Medical Center in Denver. On March 22, 1985, K.W. was readmitted to the hospital for a postpartum hemorrhage. An emergency hysterectomy was performed, and in the course of her treatment, K.W. received four units of whole blood and two units of packed red blood cells supplied by Belle Bonfils Memorial Blood Center (Belle Bonfils).[1] One of the six units of blood K.W. received was contaminated with the AIDS virus. K.W. and her husband, C.W., filed suit against Belle Bonfils for negligent screening of the contaminated donor and negligent testing of the blood.[2] K.W. and C.W. allege that Belle Bonfils was negligent in screening donors and testing donated blood. K.W. and C.W. contend that when the laboratory test became available to indicate the presence of the AIDS virus, Belle Bonfils should have applied the test promptly. They further argue that when profiles of the high risk groups developed, Belle Bonfils should have specifically screened each donor as to the high risk profiles.
In April 1986, the donor of unit No. 4989MB, which had been received by K.W. on March 22, 1985, returned to Belle Bonfils to donate blood. The donor's blood was tested for antibodies to the HIV virus,[3] with a positive result. Belle Bonfils notified the hospitals which had received prior donations from the donor, and advised the *1005 hospitals to notify the physicians of the patients who had received the donor's blood so that the patients could be tested. As a result of these notifications, K.W. was tested for the HIV virus in August 1986. K.W. tested positive and filed this action against Belle Bonfils.
Respondents sought disclosure of the identities of each of the six donors whose blood she used, and production of all of the donors' records. Belle Bonfils objected to the requests for discovery, but by agreement provided copies of the front and back of each of the donor cards for the six units of blood received by K.W. Identifying information, consisting of name, address, business and home phone numbers, birthdate, social security number, "recognition,"[4] and signature, was deleted from the produced cards. None of the medical history or health examination information was deleted from the cards.[5] Respondents also requested the donor cards relating to all prior donations of the one donor who subsequently tested positive for HIV antibodies. Those donor record cards were produced in a similar manner, with identifying information deleted. Only the infected donor's donor card is in the record that is before us.
Respondents subsequently filed a motion to compel discovery of the donors' identities and the complete donor record cards. On December 1, 1987, the trial court ordered Belle Bonfils to produce for K.W. and C.W. the unmasked donor card of the HIV-positive donor. The court's order expressly allowed the respondents to contact the donor and to attempt to determine his medical history.[6] The trial court also ordered respondents' attorney to keep the information strictly confidential, in the absence of a written order of the court. Disclosure of unmasked donor records of the other five donors was denied, but the trial court did not foreclose the possibility that such further discovery might be permitted at a later time.

II.
Before any information on AIDS was available in the medical community, Belle Bonfils utilized a screening and testing procedure on all potential donors. The purpose of the screening and testing procedure was to avoid accepting undesirable blood, and to protect the donor from injury in the process of giving blood. Donors were excluded on the basis of medical history, such as exposure to hepatitis or syphilis. Other grounds for either temporary or permanent deferment included a history of blood disease, tuberculosis, malaria, cancer, heart problems, epilepsy, unexplained weight loss,[7] or the taking of certain medications.
As of July 1982, Belle Bonfils donor screening criteria avoided accepting blood from some individuals at risk for AIDS. Belle Bonfils representatives attended a meeting in November 1982, of the American Association of Blood Banks and a meeting in December 1982, of the American Society of Hemotology. At both meetings, Belle Bonfils heard reports regarding an infant who acquired AIDS as a result of a tainted transfusion.
*1006 In late December 1982, Dr. Robert G. Chapman, the Director of Belle Bonfils, met with a member of Denver's Disease Control Services, and a representative of the Gay and Lesbian Community Center of Colorado. The purpose of the meeting was to discuss the best way to inform the gay community that male homosexuals should no longer donate blood. The Gay and Lesbian Community Center agreed to advise gay males not to donate blood. Belle Bonfils claims that it experienced "good cooperation" with the self-screening program.
In February or March, 1983, Belle Bonfils, in addition to its existing donor medical history interviewing procedure, implemented specific questioning of blood donors concerning the risks and symptoms of AIDS. The new screening procedures included informing donors about the risk factors for AIDS and the general symptoms of the illness. Donors were asked whether they had any symptoms of the disease, and if they were associated with any of the groups at risk, such as intravenous drug users or male homosexuals. Belle Bonfils admits that persons who answered any of these questions affirmatively were not to be accepted as blood donors.
Belle Bonfils revised its "Guidelines for Conducting a Blood Donor Medical History Interview" (guidelines) in December 1983. The guidelines set forth a twofold purpose: first, to insure that the donor could safely tolerate the removal of one pint of blood, and second, to avoid the possibility that the donated blood could transmit an infection to the recipient. The standards for determining when a potential donor should be deferred are set out in a Belle Bonfils directive to its donor technicians. Under a category entitled "Miscellaneous Deferments," the instructions provide: "AIDS (acquired immune deficiency syndrome) any donor with close exposure to persons with AIDS should be indefinitely deferred. Groups at highest risk are I.V. drug users, Haitian immigrants, homosexual males with multiple sexual contacts, and hemophilic patients with large numbers of transfusions." At the time the donor whose blood infected K.W. gave his donation in March 1985, each donor was asked to read an AIDS information sheet. The information sheet defined AIDS and listed the groups of society that are at risk. The instructions also state:
Because of this suggestion (that of carrying the AIDS virus), your blood bank is asking that you voluntarily refrain from donating blood at this time if you are in any of the groups listed above. Although the majority of members of these groups are not carriers, there is presently no good way to detect carriers and thus no means to identify those few who may be at risk.
The HIV virus was first identified in late 1983 or early 1984. In the fall of 1984, a laboratory began to presell test-kits for the AIDS virus to blood banks. The laboratory developed a commercially feasible test, known as the ELISA test. These kits were first licensed by the FDA on March 2, 1985. Belle Bonfils received its first shipment of the test kits on March 13, 1985. The blood donation that infected K.W. was given on the same day. After this action was commenced, Belle Bonfils asserted that the ELISA test was not available to test K.W.'s blood because the Bonfils' staff was being trained on the test procedures from March 13, 1985 to March 31, 1985. ELISA testing of all blood donations did not begin until April 1, 1985.
Thus, as of March 13, 1985, when the infected donor's blood was transfused, a four-part screening and testing process was employed by Bonfils. Potential donors were given the AIDS information sheet describing the risks of donating HIV positive blood. The donors were then asked thirty yes/no questions listed on the donor card, which were directed to their specific medical history. The responses on the card were then reviewed by a Belle Bonfils technician, who had been instructed to follow the guidelines in making the decision whether to accept blood from the potential donor. Thereafter, the donated blood was tested for hepatitis B, syphilis, and various antibodies, not including HIV. Belle Bonfils did not routinely screen for AIDS until approximately two weeks following the receipt of the blood that infected K.W.

*1007 III.

A.
One basic issue is presented by the plaintiffs' complaint: whether Bonfils was negligent in screening and testing its blood donors. In order to prosecute their negligence claims, respondents are endeavoring to discover whether Bonfils followed its own screening procedures before it accepted blood from the infected donor. Discovery of the circumstances which resulted in the infected blood being given to Belle Bonfils can be made from only two sources. One source is the Belle Bonfils technician who interviewed the donor and the other is the donor.
The respondents assert that Bonfils failed to follow its established screening and testing procedures before accepting blood from the donor whose infected blood was transfused to K.W. As stated by Bonfils, a significant aspect of its screening process used at the time of the transfusion was a questionnaire given to potential donors. The donor's medical history was determined solely from the thirty yes/no questions on the Belle Bonfils donor card. The questions were designed to determine the donor's fitness to donate blood. According to Bonfils' written guidelines, an unsatisfactory answer to any one of the thirty questions was grounds for temporarily or permanently refusing blood from a potential donor. In order to determine whether the deferment should be temporary or permanent, a Bonfils technician was required to go beyond the yes/no questions and specifically ask the donor about the unsatisfactory responses. Then, depending on the donor's explanation and the guideline's instructions, the donor was either accepted, or temporarily or permanently deferred.
The card of the donor of the AIDS-infected blood indicates that four of the thirty key questions for deferral were unsatisfactorily answered. Specifically, the donor's answers indicated that: (1) he had had recent medications, vaccinations, or injections; (2) he had been previously deferred as a donor; (3) he had been out of the United States within the past three years; and (4) he had had venereal disease in the past. "O.K." was manually inscribed over each of these four responses, presumably by the Bonfils technician.
At the top of the donor's card were the handwritten words "lopresser," "ghonnorea [sic]," "↑B/P," "Germ, Copenhagen Denmark." Presumably, these words were written by the technician and were the technician's explanations of the four unsatisfactory answers on the donor card. Read in conjunction with these answers, a profile of the donor becomes apparent. He had taken the drug "lopresser" within two weeks of his visit to Bonfils. He had been deferred previously as a donor because he suffered from high blood pressure. Germany and Copenhagen, Denmark were the foreign countries he had been to within three years. At some point, he had had gonorrhea.
The issue for us to resolve here is simple. Is the donor's card by itself sufficient to determine whether the Bonfils' technician followed Bonfils' established guidelines in allowing the donor to donate what turned out to be AIDS-infected blood? Because the donor cards fail to reveal anything about the guidelines or whether the guidelines were followed by the technician, we conclude the donor's card, without additional discovery, is insufficient to meet the minimum requirements of C.R.C.P. 26(b).
C.R.C.P. 26(b)(1) provides, in pertinent part: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Thus, one issue is whether the information sought is privileged and, if not privileged, whether the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Dolan v. Mitchell, 179 Colo. 359, 502 P.2d 72 (1972); Lucas v. District Court, 140 Colo. 510, 345 P.2d 1064 (1959). An analysis of the record demonstrates the need for discovery of more than the donor's card if the information sought is not privileged.

*1008 B.
The Bonfils' guidelines contained in the record reflect that, if a potential donor indicates that he has had medication in the two weeks previous to his visit to the blood bank, the technician is to "[t]ry to elicit from the donor the underlying condition for which the medication [is] prescribed. In most instances, it is the condition that necessitates the deferment rather than the medication." The donor card, with merely the word "lopresser" written at the top, does not reveal whether the technician asked what underlying condition required the donor to take lopresser. Nor does the card indicate whether the donor took the lopresser less than two weeks prior to donating blood. Because it cannot be determined from the card alone whether the technician complied with the guidelines, further inquiry through sources of information other than the donor's card is warranted.
The second question the donor answered unsatisfactorily was whether he had ever been deferred as a donor. The guidelines provide that before accepting a donor who answers "yes" to this question, the technician "need[s] to know whether temporary or permanent cause [sic]." We interpret this to mean that the technician must learn why the donor was previously deferred and then must determine whether that reason is a temporary or permanent cause for deferment. The donor's card contains the symbol "↑B/P," which may mean high blood pressure. However, there is no indication whether the donor's high blood pressure, either as an independent condition or a symptom of another condition, was grounds for temporarily or permanently deferring him. Accordingly, we hold that the donor card alone does not establish that the technician acted in accordance with the Bonfils' guidelines with respect to this particular question.
The donor's third unsatisfactory answer was that he had been out of the United States within the past three years. The guidelines provide that where this question is checked "yes," the technician is to:
Defer for six months if malaria area is visited and donor did not take preventive medication. If a resident of area or on preventive medication, defer 3 years.... NOTE: If visit limited to malaria-free city and no trips of any kind taken into surrounding countryside, donor is acceptable.
The only words appearing on the donor's card regarding this question are "Germ" and "Copenhagen Denmark." There is no indication whether the donor was a resident of Germany or Copenhagen. Nor was there any indication that the technician had asked whether the donor had made any trips into the surrounding countryside while visiting Germany or Copenhagen. Whether the technician made these inquiries is not known because the cards contained none of this information. Again, relying solely upon the donor's card, it cannot be ascertained whether the guidelines were followed by the Bonfils' technician.
The last unsatisfactory answer by the donor was in response to whether he had ever had a venereal disease. According to the guidelines, the following procedures are to be followed in this situation: "Gonorrhea or `clap'accept if treatment completed." The donor's card contains the word "ghonnorea [sic]." Nowhere is it noted that treatment for the disease was completed. Thus, further discovery should be permitted to determine whether the technician followed the guidelines regarding this unsatisfactory answer by the donor.
In essence, the guidelines effectively mandate that where any of the thirty donor card questions are unsatisfactorily answered, the technician must make certain follow-up inquiries. These inquiries determine whether the donor will be accepted, and determine whether the technician has followed the Bonfils guidelines. The donor cards are not designed to indicate whether the follow-up questions were asked or, if they were asked, what the responses were. Nor is the card designed to indicate whether the responses were interpreted by the technician in a manner consistent with the Bonfils guidelines. The basis for K.W.'s claims before us is that the donor's card does not contain sufficient information to *1009 determine whether the technician complied with the Bonfils guidelines. In light of our foregoing discussion, we agree.

IV.
Belle Bonfils claims that the identities of the volunteer blood donors whose blood was transfused to K.W. are confidential and privileged and may not be discovered without violating the public policies of the State of Colorado and the privacy interests of the volunteer donors. See §§ 25-4-1404, -1409, 11 C.R.S. (1987 Supp.); § 13-90-107(1)(d), 6A C.R.S. (1987); C.R.C. P. 26(c). In our view, the identity of the donor should not be disclosed but limited discovery should be permitted.

A.
Petitioner asserts that records created and maintained by a blood bank that include the identity of a donor, as well as medical histories and physical examinations, fall within the ambit of the physician-patient privilege established by section 13-90-107(1)(d), 6A C.R.S. (1987), which states:
A physician, surgeon, or registered professional nurse duly authorized to practice his profession pursuant to the laws of this state or any other state shall not be examined without the consent of his patient as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.
"The physician-patient privilege is statutorily created and must, therefore, be strictly construed. The burden of establishing the applicability of the privilege rests with the claimant of the privilege." Williams v. People, 687 P.2d 950, 953 (Colo.1984) (citations omitted). The record does not reflect that the donor was seen by a physician or that he received medical care.
Kathyrn Hall, who interviewed the donor, was not a medically trained physician, surgeon, or professional nurse, and, at the time the donor provided blood to Belle Bonfils, no physician, surgeon, or registered nurse was physically present. The privilege does not include communications with medical technicians, Block v. People, 125 Colo. 36, 240 P.2d 512 (1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). If "[n]othing in the record reflects that the blood donors were seen by a physician or received medical care when they donated blood," the physician-patient privilege is not applicable. Tarrant County Hosp. Dist. v. Hughes, 734 S.W.2d 675 (Tex.App.1987). But see Head v. Colloton, 331 N.W.2d 870 (Iowa 1983); Krygier v. Airweld, 137 Misc.2d 306, 520 N.Y.S.2d 475 (1987).
Respondents seek disclosure of the infected donor's name, address, and telephone number. In Wolf v. People, 117 Colo. 279, 187 P.2d 926 (1948), aff'd, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), we held that the physician-patient privilege does not extend to names, addresses, and telephone numbers. Such information, in our view, was not "acquired in attending the patient" nor was the information "necessary to enable him [the physician] to prescribe or act for the patient." § 13-90-107(1)(d), 6A C.R.S. (1987). Accordingly, we conclude that the information requested by the respondents is not subject to the physician-patient privilege.

B.
Petitioner next asserts that disclosure of the identity of any individual who is known to test positive for the HIV virus is prohibited by sections 25-4-1404[8] and *1010 -1409(2),[9] 11 C.R.S. (1987 Supp.). Section 2-4-202, 1B C.R.S. (1980), provides: "A statute is presumed to be prospective in its operation." In reviewing the relevant statutes we find nothing in the legislative enactments which would reflect an intent to overcome this presumption. People v. Holland, 708 P.2d 119 (Colo.1985); California Co. v. State, 141 Colo. 288, 348 P.2d 382 (1959), appeal dismissed, 364 U.S. 285, 81 S.Ct. 42, 5 L.Ed.2d 37 (1960). The donor whose blood contaminated K.W. with the AIDS antibody tested positive on the HIV test in April 1986. K.W. and C.W. filed this lawsuit in February 1987. They first requested disclosure of the information in April 1987. The effective date of sections 25-4-1401 and -1410 was June 8, 1987. Therefore, sections 25-4-1401 and -1409(2) are to be applied prospectively, and do not apply to this action. Because nothing in the statutory scheme demonstrates intent on the part of the General Assembly to give the relevant statutes a retroactive effect we conclude that sections 25-4-1404 and -1409(2) do not apply to the facts of this case.

C.
Petitioner also asserts that compelling public policy grounds, including the maintenance of the supply of volunteer blood and the privacy interests of volunteer blood donors, require that discovery of the identities of volunteer blood donors be prohibited. We disagree.
C.R.C.P. 26(c) allows the trial court to issue protective orders as justice requires "to protect a party ... from annoyance, embarrassment, or oppression, or undue burden or expense." A party who opposes discovery bears the burden of establishing the need for a protective order. Liedholt v. District Court, 619 P.2d 768, 771 (Colo. 1980).
When determining the extent materials sought to be discovered may be protected, the trial court must balance the competing interests that would be served by granting or denying discovery. Bond v. District Court, 682 P.2d 33 (Colo.1984). The balancing test is accomplished by weighing the respective parties' interests in discovery of material facts against, in this case, a public policy interest in confidentiality. Liedholt, 619 P.2d at 770. In determining the discoverability of an HIV-positive donor's identity, courts have applied a similar balancing test comparing the interest served by the state action[10] with the donor's interest in privacy.
In Tarrant County Hospital District v. Hughes, 734 S.W.2d 675 (Tex.App.1987), *1011 Tarrant County Hospital District (Tarrant) requested the issuance of a writ of mandamus to the trial court's order which compelled Tarrant to release and make available to the plaintiff certain documents identifying blood donors. The plaintiff in that case alleged that the deceased was given blood transfusions by Tarrant which resulted in her contracting Acquired Immune Deficiency Syndrome (AIDS), and ultimately in her death. Plaintiff further alleged that Tarrant failed to exercise the reasonable degree of care and skill in treatment ordinarily exercised by the hospital, as well as failed to provide a wholesome blood product. Ruling on Tarrant's objection to its request for production of information relating to blood donors, the trial court ordered Tarrant to disclose the identities and addresses of the blood donors. The court also ordered the plaintiff not to directly or indirectly contact any donor or undertake further discovery regarding such donors until permitted to do so by further order of the court.
The Texas Court of Appeals held "that the trial court order compelling [Tarrant] to identify blood donors is not an impermissible violation of their rights to privacy." Id. at 679. In conducting its balancing test, the court first acknowledged the legitimacy of the plaintiff's interest in the identification of the blood donors. It reasoned that the information was necessary for the plaintiff to pursue her cause of action against Tarrant. The court stated that the trial court's order protected the donor from public disclosure by prohibiting the plaintiff from contacting any donor identified through the produced records. The court also said that no evidence had been produced to suggest that the information sought by the plaintiff would be used improperly. The court concluded: "Because the trial court's order evidences a proper concern with protection of the individual's right of privacy, we hold that the record does not establish an invasion of any constitutionally protected right for liberty of the blood donors." Id. at 680 (citing Whalen v. Roe, 429 U.S. 589, 606-07, 97 S.Ct. 869, 879-80, 51 L.Ed.2d 64 (1977)).
In Rasmussen v. South Florida Blood Service, 500 So.2d 533 (Fla.1987), Rasmussen suffered injuries which required hospitalization. While in the hospital, he received fifty-one units of blood via transfusion. Approximately one year later he was diagnosed as having AIDS and later died as a result of the disease. Prior to his death, Rasmussen filed suit and sought to obtain all records, documents, and other materials indicating the names and addresses of the fifty-one blood donors from South Florida Blood Service. The blood service requested a protective order barring such disclosure. The trial court, however, denied the motion and ordered the blood service to disclose the subpoenaed information. The Third District Court of Appeals for Florida applied the test traditionally employed under the Florida discovery rules and concluded that the requested material was not discoverable. See South Florida Blood Serv. v. Rasmussen, 467 So.2d 798 (Fla.Dist.Ct. App.1985). In affirming the court of appeals decision, the Florida Supreme Court concluded:
Although we agree with respondent's contention that Rasmussen's blood donors' rights of privacy are protected by state and federal constitutions, we need not engage in the stricter scrutiny mandated by constitutional analysis. We find that the interests involved here are adequately protected under our discovery rules and approve the decision of the district court.
Rasmussen, 500 So.2d at 534-35. In so holding, the court balanced the competing interests that would be served by granting discovery or by denying it. In analyzing the privacy interests of the donors, the court stated: "Some method could be formulated to verify the blood service's report that none of the donors is a known AIDS victim while preserving the confidentiality of the donors' identities. However, the subpoena in question gives petitioner access to the names and addresses of the blood donors with no restrictions on their use." Id. at 537. The court found that disclosure of information relating to the donor implicates constitutionally protected privacy interests. Disclosure of such information, *1012 according to the court, would also deter blood donation and for that reason "society's interest in a strong and healthy blood supply will be furthered by the denial of discovery." Id. at 538.
The Rasmussen court noted the plaintiff's interest in obtaining the requested information to obtain full recovery and the state's concomitant interest in ensuring full compensation for victims of negligence, but concluded that the discovery order requested would do little to advance those interests. "The potential of significant harm to most, if not all, of the fifty-one unsuspecting donors in permitting such a fishing expedition is great and far outweighs the plaintiff's need under these circumstances." Id.[11]
Finally, in Krygier v. Airweld, Inc., 137 Misc.2d 306, 520 N.Y.S.2d 475 (1987), the New York Blood Center, on reargument to the trial court, sought a protective order precluding Krygier from obtaining the names and addresses of twenty-one blood donors. Plaintiff alleged that during the course of treatment for severe burns, her deceased husband received donated blood which was infected with the HIV virus. She alleged that the transfusion caused her husband to contract AIDS.
Although the Krygier court stated that it "need not reach a [c]onstitutional analysis to arrive at its decision," it proceeded to employ a balancing test identical to that relied upon in Tarrant and Rasmussen. In reaching the conclusion that the blood center produce the donation records, but without revealing the names and addresses of the donors, the court stated:
The blood bank's interest in maintaining the anonymity of their donors together with society's interest in maintaining the free flow of volunteer blood far outweigh the plaintiff's right to the disclosure of all evidence material and necessary to the prosecution of her suit.
Id., 520 N.Y.S.2d at 477.
Petitioner asserts that the privacy rights of blood donors must be protected; that the compelling interest of society in maintaining a safe and adequate supply of volunteer blood donations requires that the identities of blood donors be protected from discovery; and that the district court failed to properly balance the interests of the donors and of society in the preservation of confidentiality with the plaintiffs' interest in disclosure of donor identities. As Tarrant and Rasmussen indicate, the discovery requested in this case not only implicates privacy interests of the donor, as well as societal interests, but also impacts the rights of plaintiffs to obtain full recovery.
In balancing the competing interests here, the donor has a privacy interest in remaining anonymous and avoiding the embarrassment and potential humiliation of being identified as an AIDS carrier.[12] Belle Bonfils, and society as a whole, have an interest in maintaining the availability of an abundant supply of volunteer blood for distribution to numerous hospitals. These interests must be weighed against K.W.'s and C.W.'s rights to the disclosure of all information necessary to pursue their claims. However, society as a whole also has an interest consistent with that of K.W. and C.W.; namely, that of maintaining a safe blood supply. Bonfils cannot claim absolute immunity from discovery *1013 when it is in the business of providing a product capable of transmitting disease.
The claims against Bonfils will turn primarily on whether K.W. and C.W. can establish that Bonfils failed to adequately screen and test the blood that infected K.W. in March of 1985. In our view, the masked donor cards made available to K.W. and C.W. do not provide them with sufficient information relating to the screening and testing procedures that will permit them to prosecute their claims. Therefore, in order to prosecute their claims, it is necessary for K.W. and C.W. to have controlled access to the donor to discover whether, from the donor's perspective, the screening procedures were followed.[13]
Since there is a genuine negligence issue, respondents should not be denied the opportunity of pursuing discovery directed at events that transpired when the infected blood was donated.[14] While we recognize that the donor has an interest in maintaining his privacy, we conclude that, in light of the foregoing discussion, the interests of K.W. and C.W. outweigh that of the donor.

V.
Discovery matters lie largely within the sound discretion of the trial court. Neusteter v. District Court, 675 P.2d 1 (Colo.1984); In re Marriage of Mann, 655 P.2d 814 (Colo.1982). Generally, the appropriate mechanism for reviewing discovery matters is by appeal rather than by original proceeding. Neusteter, 675 P.2d at 4. When, however, a procedural ruling may significantly affect a party's ability to litigate the merits of a case and may cause damage to a party that cannot be cured on appeal, it is appropriate to challenge a trial court's order relating to matters of pretrial discovery by way of an original proceeding. Bond v. District Court, 682 P.2d 33 (Colo. 1984); Kerwin v. District Court, 649 P.2d 1086 (Colo.1982); Sanchez v. District Court, 624 P.2d 1314 (Colo.1981); Lucas v. District Court, 140 Colo. 510, 345 P.2d 1064 (1959).
It is our duty in this original proceeding to tailor a limited procedure for discovery to protect the rights of all parties. See Bond, 682 P.2d at 36; Kerwin, 649 P.2d at 1088; Sanchez, 624 P.2d at 1316. As the Rasmussen court acknowledged, discovery can be conditioned so that the plaintiff can obtain the needed information "while preserving the confidentiality of the donors' identities." Rasmussen, 500 So.2d at 537.
C.R.C.P. 26(b)(1) permits a party in civil litigation to obtain discovery of any matter which is not privileged and which is relevant to the subject matter involved in the pending case. As it is our duty to fashion a discovery remedy, we must examine the Colorado Rules of Civil Procedure to determine which method of discovery is suitable. An oral deposition pursuant to C.R.C.P. 30 is not appropriate, as the identity of the donor must be protected. Written interrogatories and requests for production are similarly unavailable because the donor is not a party to this action. See C.R.C.P. 33. In our view, the only viable discovery device is a deposition upon written questions, *1014 pursuant to C.R.C.P. 31. While C.R.C.P. 31 is rarely used, and is seldom the most desirable means of pursuing discovery, it is suitable to protect the identity of the donor, and allow K.W. and C.W. to obtain relevant information relating to their claims of negligence.
The written questions are to be submitted by respondents to the clerk of the district court. The clerk of the district court will be provided with the current name and address of the infected donor by Belle Bonfils' attorney. The clerk of the court will then mail the written questions by certified mail designated for delivery only to the addressee, the person identified as the infected donor, who, after answering the questions, will return them to the clerk. The clerk shall keep the name and address of the donor in the strictest confidence. The written questions shall be crafted and limited so that the identity of the donor is not revealed. Respondents may not ask the name of the donor or his address. Before providing answers to plaintiffs' attorney, the clerk of the court shall mask any signatures or other identifying information. Such relief, in our view, permits the respondents to obtain the information they require, without risking the potentially adverse consequences of disclosing publicly the identity of the donor and without burdening the competing interests of the blood bank, or infringing upon society's interests in a safe, adequate, voluntary blood supply.
Accordingly, we make the rule absolute in part and discharge the rule in part.
QUINN, C.J., dissents, and VOLLACK and MULLARKEY, JJ., join in the dissent.
QUINN, Chief Justice, dissenting:
I respectfully dissent from this court's authorization of discovery procedures which permit C.W. and K.W., individually and as next friend of their son, R.W., (hereinafter collectively referred to as plaintiffs) to serve the blood donor, through the clerk of the court, with written deposition questions concerning "information relating to their claims of negligence." At 1014. In my view, the statutory scheme relating to HIV (AIDS) infection, §§ 25-4-1401 to -1410, 11 C.R.S. (1987 Supp.), and a proper balancing of interests pursuant to C.R.C.P. 26 militate strongly in favor of making the rule absolute in its entirety and prohibiting any further discovery directed to the blood donor.

I.
The plaintiffs in this case claim that the Belle Bonfils Memorial Blood Center (Belle Bonfils) was negligent in screening blood donors and in testing donated blood, as a result of which K.W. contracted the HIV virus in the course of receiving six units of blood in March 1985. When K.W. received the blood, the ELISA test for antibodies to the AIDS virus had just been approved by the Food and Drug Administration, and Belle Bonfils was in the process of establishing its laboratory procedures and training its personnel to perform the new test. The ELISA test, therefore, was not available prior to K.W.'s blood transfusions.
K.W.'s positive antibody status was discovered after one of the donors returned to Belle Bonfils in April 1986 and tested positive for HIV antibodies. Belle Bonfils notified the hospitals which had received prior donations from this person and advised them to notify the physicians of the patients who had received the donor's blood so that the patients could be tested. As a result of these notifications, K.W. was tested in August 1986, and this civil action against Belle Bonfils was commenced in February 1987.
The plaintiffs filed interrogatories and requests for production of documents, seeking disclosure of the identities of each of the donors and production of all records of the donors. Belle Bonfils objected to these discovery requests, but by agreement provided the plaintiffs with copies of the fronts and backs of each of the donor cards for the six units of blood received by K.W. All identifying informationsuch as the name, address, business and home telephone numbers, birthdate, social security number, the name of the organization for whose credit the blood is donated, and the donor's signaturewere deleted from each of the cards produced. None of the medical history or health examination information, *1015 however, was removed from any card. Each card thus clearly showed the weight, oral temperature, blood pressure, and hemoglobin of the donor, as well as the answers checked by the donor concerning medical history, any comments written by the blood center interviewer, and, if indicated on the original card, the donor's sex,[1] previous blood group, and prior donations. In addition, Belle Bonfils produced the donor cards relating to all prior donations of the one donor who tested positive for HIV antibodies, again with all identifying information deleted.
On October 16, 1987, the plaintiffs filed a motion to compel discovery of the identities of the donors and the complete donor record cards, claiming that such information was necessary to enable them to establish the negligence of Belle Bonfils. On December 1, 1987, the district court heard arguments on the motion to compel and ordered Belle Bonfils to disclose the complete donor card of the person who tested positive for the HIV antibody, including the donor's identity. It is in this procedural posture that the case is before us at this time.

II.
I read section 25-4-1404, 11 C.R.S. (1987 Supp.), as creating a statutory privilege with respect to the identity of blood donors, and, in my view, the application of this statutory privilege to the district court's discovery order in this case would not constitute a retrospective application of the statute.
Because of the rapid spread of the AIDS virus, the Colorado General Assembly in 1987 enacted legislation which establishes reporting requirements for AIDS cases, creates confidentiality with respect to the identity of persons diagnosed as having AIDS or HIV related illness, and outlines the public health and emergency procedures for treating such persons. §§ 25-4-1401 to -1410, 11 C.R.S. (1987 Supp.).[2] This statutory scheme became effective on June 8, 1987. Ch. 208, § 2, 1987 Colo.Sess. Laws 1130, 1137. In enacting this legislation, the General Assembly stated that the HIV virus that causes AIDS is an infectious and communicable disease which endangers the public health and then declared
that reporting of HIV infection to public health officials is essential to enable a better understanding of the disease, the scope of exposure, the impact on the community, and the means of control and that efforts to control the disease should include public education, counseling, and voluntary testing and that restrictive enforcement measures should be used only when necessary to protect the public health.
§ 25-4-1401, 11 C.R.S. (1987 Supp.).
In keeping with this legislative declaration of purpose, section 25-4-1402, 11 C.R.S. *1016 (1987 Supp.), requires all attending physicians, "[a]ll other persons treating a case of HIV infection in hospitals, clinics, sanitariums, penal institutions, and other private or public institutions," to make a written report to the state or local department of health concerning every individual known to have a diagnosis of AIDS or HIV related illness. The report must contain the name, date of birth, sex, and address of the individual so diagnosed, as well as the name and address of the physician or other person making the report, and must be filed within twenty-four hours after such fact comes to the knowledge of the physician or other person rendering treatment. Id. In similar fashion, section 25-4-1403, 11 C.R.S. (1987 Supp.), requires all clinical laboratories rendering diagnostic service to report this same information to the state or local department of health with respect to any individual whose specimen for examination tests positive for HIV antibody or virus. Section 25-4-1404(1), 11 C.R.S. (1987 Supp.), states that such information shall be "strictly confidential medical information" and, in keeping with this statutory privilege of confidentiality, provides as follows:
Such information shall not be released, shared with any agency or institution, or made public, upon subpoena, search warrant, discovery proceedings, or otherwise, except under any of the following circumstances:
(a) Release may be made of medical or epidemiologic information for statistical purposes in a manner such that no individual person can be identified.
(b) Release may be made of medical or epidemiological information to the extent necessary to enforce the provisions of this part 14 and related rules and regulations concerning the treatment, control, and investigation of HIV infection by public health officials.
(c) Release may be made of medical or epidemiological information to medical personnel in a medical emergency to the extent necessary to protect the health or life of the named party.
Any physician, health care provider, officer or employee of a state or local department of health, or any person, firm, or corporation who releases or makes public the confidential medical informationthat is, the name, date of birth, sex, and address of the individual reported, and the name of the physician or other person making the reportis guilty of a misdemeanor punishable by a fine of $500 to $5,000, by imprisonment in the county jail for not less than six months or more than twenty-four months, or by both fine and imprisonment. § 25-4-1409(2), 11 C.R.S. (1987 Supp.).
In this case, the donor tested positive for HIV antibodies in April 1986, before the statutory reporting requirements became effective. However, even prior to the effective date of the statute, a Colorado Department of Health Regulation required attending physicians and clinical laboratories, such as Belle Bonfils, to report AIDS cases to the Department of Health. 6 C.C.R. 1009-1 (1984). The report was to include the patient's name, age, sex, address, the name and address of any responsible physician, and such other information as might be needed to locate the patient for follow-up treatment. Id. The regulation also provided that all reports submitted to the Colorado Department of Health in compliance with the regulation were deemed "to be confidential medical information." Thus, prior to June 8, 1987, Belle Bonfils and other clinical laboratories rendering diagnostic services were already required by regulation to report AIDS cases, and the information reported to the Colorado Department of Health was vested with the status of "confidential medical information."
Although the General Assembly in enacting the 1987 legislation did not intend to retroactively require reporting entities to submit new reports concerning AIDS cases diagnosed prior to June 8, 1987, it did intend, in my view, to vest information acquired by the reporting entities concerning the identity of a person diagnosed as having AIDS or HIV related illness with the status of "strictly confidential medical information," § 25-4-1404(1), 11 C.R.S. (1987 Supp.), whether such information was acquired by the reporting agency prior to or *1017 subsequent to the effective date of the 1987 legislation. Unless the statutory prohibition against disclosure is so construed, it will have the anomalous effect of permitting a blood bank or other reporting health care facility to publicly disclose the identities of all persons diagnosed as having AIDS or HIV related illness, or testing positive for HIV antibody or virus, as long as such condition was diagnosed prior to June 8, 1987. Such disclosures would constitute a direct assault on the privacy interests of those persons diagnosed as having AIDS or HIV related illness prior to June 8, 1987, in clear contravention of the legislative goal of preserving confidentiality.
In contrast to the majority, I do not view the application of the statutory prohibition against disclosure of the donor's identity as a retrospective operation of that prohibition. The confidentiality provision focuses on the prospective disclosure, not the retrospective collection, of the protected information. The plaintiffs did not file a motion to compel until October 16, 1987, approximately four months after the 1987 legislation became effective, and the district court did not enter its order of disclosure until December 1, 1987, six months after the effective date of the statute. Since the information sought by the plaintiffs is the very information cloaked with the status of "strictly confidential medical information," § 24-4-1404(1), 11 C.R.S. (1987 Supp.), I would apply the statutory prohibition against disclosure to the plaintiffs' motion to compel. This construction, in my view, is consistent with the expressed legislative purpose of protecting the identity of persons diagnosed as having AIDS or HIV related illness by preventing the prospective disclosure of such information in discovery proceedings conducted in civil litigation subsequent to the effective date of the statute, § 25-4-1404(1), 11 C.R.S. (1987 Supp.), even though such information might have been acquired before the effective date of the statute.

III.
Putting aside the applicability of section 25-4-1404(1) to this case, I am unable to endorse the discovery procedures which this court authorizes pursuant to C.R.C.P. 26. These procedures permit the plaintiffs to serve the blood donor, through the clerk of the court, with written deposition questions in accordance with C.R.C.P. 31, so long as such questions do not involve the donor's identity. The balancing process employed by the court in authorizing these discovery procedures fails to adequately consider the privacy interests of the donor and the equally important societal interests in maintaining an adequate supply of voluntary blood.
C.R.C.P. 26(b)(1) permits a party in civil litigation to obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." A trial court is permitted to fashion protective orders regarding discovery when, in the interest of justice, it is necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." C.R.C.P. 26(c). There are three interests that must be balanced in this case: the interest of the plaintiffs in obtaining information relevant to their claim; the privacy interest of the blood donor in prohibiting the disclosure of his identity as a person diagnosed as having AIDS or HIV related disease; and society's interest in maintaining an adequate supply of voluntary blood donations.

A.
The plaintiffs obviously have a significant interest in discovering information relevant to their claim against Belle Bonfils for the tragic consequences resulting from the transfusions that infected K.W. with AIDS, and this interest should not be taken lightly. I am satisfied, however, that this interest has been adequately accommodated by Belle Bonfils' tender of the redacted documents relating to the donors of blood received by K.W. in March 1985, including the donor who subsequently tested positive for HIV antibodies.
The claims against Belle Bonfils will turn primarily on whether the plaintiffs can establish that Belle Bonfils failed to adequately *1018 screen and test the blood donation that was ultimately given to K.W. during her hospitalization in March 1985. As the majority opinion so cogently demonstrates, the redacted records and other information already made available to the plaintiffs provide them with an abundance of information relating to their claim that Belle Bonfils was negligent in screening blood donors and in testing donated blood. Any inquiry of the blood donor is likely to add little information, if any at all, to the records already made available to the plaintiffs. Even if the donor could recall other questions that were asked by the blood bank techniciana very unlikely recollection in view of the elapsed time and the fact that this donor had given blood on many other occasionsany questions asked but not recorded by the technician will be equally probative of any alleged negligence as if the questions had not been asked at all.
The majority asserts that "the donor cards fail to reveal anything about the guidelines or whether the guidelines were followed by the technician...." At 1007. I disagree with this assertion. The cards themselves are the best evidence of the adequacy or inadequacy of the procedures utilized by Belle Bonfils in screening blood donors. Belle Bonfils keeps these donor records in part to document the blood bank's screening procedures. What is recorded is intended to reflect what was asked. If the donor card does not provide sufficient information to allow an informed decision to be made about donor eligibility, then the screening procedures might well be deemed inadequate. While the cards do not reveal whether this particular donor answered each question honestly, that is not in question here. The screening procedures employed by Belle Bonfils relied heavily on candid responses from donors, a factor to be considered in deciding on the adequacy of the screening procedures. Testimony from donors, even the infected donor, will add little to the evidence provided on the cards.
I also disagree with the majority's claim that "[d]iscovery of the circumstances which resulted in the infected blood being given to Belle Bonfils can be made from only two sources," the interviewing technician and the donor. At 1007. The plaintiffs have at their disposal the full range of discovery methods authorized by C.R.C.P. 26, not only with respect to the technician who interviewed the blood donor, but also with respect to other persons at Belle Bonfils familiar with the screening and testing procedures utilized by the blood center on or shortly before March 13, 1985, when the donation in question was given. The plaintiffs also will have adequate opportunity to seek out expert opinion testimony concerning the efficacy of the screening and testing procedures used by Belle Bonfils in this case. Expert testimony will be particularly helpful in determining whether the recorded information about follow-up questions is sufficiently clear and detailed to allow an accurate decision to be made about donor eligibility, and also whether, given the recorded information, this donor should have been allowed to give blood.
I view any further interrogation of the blood donor as offering only speculative value to the plaintiffs' ability to effectively prosecute their claim. Any such speculative value is far outweighed by the donor's interest in privacy and society's interest in maintaining an adequate supply of blood from voluntary donors.

B.
The blood donor who will be subject to further discovery proceedings in this case has a significant privacy interest in preventing the disclosure of his identity as a person infected with AIDS or HIV related disease. This privacy interest pertains not to a pint of the donor's blood, but to the donor's identity as a person suffering from a serious medical condition, the disclosure of which might have a devastating effect on the donor's life. As such, the blood donor's privacy interest in preserving the confidentiality of his identity is entitled to substantial consideration in the balancing process. See, e.g., United States v. Westinghouse Electric Corp., 638 F.2d 570 (3d Cir.1980) (information about one's body and *1019 state of health, including medical records, is a matter of personal privacy).
The discovery process authorized by the majority will most likely result in invasive questions concerning the donor's personal lifestyle, sexual history, and other details that clearly should remain private in the absence of a truly compelling need for disclosure. The discovery techniques employed against the donor might compel him to engage legal counsel for advice. This is a heavy burden to place on an individual who, I must presume at this point in the proceedings, was not aware of any infection at the time of the blood donation in question.
I also have grave doubts about whether the majority's discovery plan can be effectively implemented. The court has authorized the clerk of the court to serve the donor with written deposition questions, and some disclosure of the donor's identity will be necessary in order to accomplish service on the donor. Since the plaintiffs have been authorized to serve written questions, fairness requires that Belle Bonfils, consistent with C.R.C.P. 31(a), be permitted to serve cross questions, the plaintiffs redirect questions, and Belle Bonfils recross questions.[3] Moreover, if the discovery method authorized by the court is to have any efficacy at all, the blood donor should be required to follow the procedure authorized by Rule 31(a) and appear before an officer authorized to administer an oath, who will then record the donor's responses to the questions.[4] At the very least, the donor should be required to swear to the truth of the responses before an officer authorized to administer oaths or before a person appointed by the court in which the action is pending. See C.R.C.P. 28(a).
Any discovery directed against the donor holds out the prospect for the pursuit of further leads uncovered in the course of limited discovery that could easily result in disclosing to the public at large the identity of the donor as a person infected with AIDS or HIV related illness. The potentially destructive effect of disclosing the identity of a person infected with AIDS or HIV related illness is well appreciated by the plaintiffs in this case, since they petitioned the court to maintain their anonymity. In describing the danger of revealing their identities, the plaintiffs stated that they "live in constant fear of social ostracism and job loss should their secret agony become known" and that any identification of them, "by name or otherwise, in connection with this lawsuit and the contracted disease AIDS, can only result in total personal tragedy and isolation from the entire community...." Ironically, the plaintiffs have sought and obtained protection for their own privacy interest but seek to compel the disclosure of the identity of the donor whose interest in not having his identity disclosed is no less important and who most likely faces the same fears as the plaintiffs have unfortunately experienced.[5]

C.
The risk of disclosing the donor's identity, which the limited discovery authorized in this case necessarily creates, should appropriately be viewed in terms of its potential impact on the ability of a blood bank to maintain an adequate supply of blood from *1020 voluntary donors. A central goal of the public health system is to "encourage, foster, and support efforts designed to bring into being an all-voluntary blood donation system and to eliminate commercialism in the acquisition of whole blood and blood components for transfusion purposes." Department of Health, Education and Welfare, National Blood Policy, Department Response to the Private Sector Implementation Plan, 39 Fed.Reg. 32,701, 32,702 (Sept. 10, 1974). Recent medical literature recognizes the importance of confidentiality and privacy in blood donations:
The laboratory has taken the stance that donors have a right to privacy and that confidentiality is essential, and so far the names have been withheld. The decision as to whether the laboratory will be forced by the court to provide the names will have a profound impact upon voluntary donations.
Wyatt, Payne, Ingram, & Quinley, AIDS: Legal and Ethical Concerns for the Clinical Laboratory, 4 J.Med.Tech. 108, 109 (1987).
There inevitably are cases in which the greater public interest compels the subordination of an individual's interest in pursuing all available forms of pretrial discovery in the course of prosecuting a claim for compensatory damages. This is such a case. Society's interest in maintaining an adequate supply of voluntary blood far outweighs the interest of a litigant in utilizing discovery devices which jeopardize that important social concern. See Rasmussen v. South Florida Blood Service, Inc., 500 So.2d 533, 537-38 (Fla.1987); Krygier v. Airweld, Inc., 137 Misc.2d 306, 309, 520 N.Y.S.2d 475, 477 (N.Y.Sup.Ct.1987).
Although the discovery authorized by this court may not threaten the nation's blood supply, I believe it stands as an unwelcome precedent for future cases. Assurances of confidentiality are an integral component of the blood donor program, and judicially sanctioning discovery procedures that minimize the privacy interest of the donor must necessarily impair to some extent the confidentiality essential to maintaining an effective voluntary blood donor program. The limited discovery sanctioned in this case can only result in giving voluntary blood donors added reason to pause in making donations due to the fear that some abnormality might appear in their blood which, in ensuing litigation involving the blood bank, might well result in the disclosure of the donor's identity and medical condition.
I would make the rule absolute in its entirety and prohibit the plaintiffs from serving written deposition questions on the blood donor, or from directing any other discovery to the blood donor.
I am authorized to say that Justice VOLLACK and Justice MULLARKEY join me in this dissent.
NOTES
[1] Belle Bonfils is a non-profit community blood center which collects and processes blood from volunteer donors, and supplies it to numerous hospitals in Denver and throughout the State of Colorado.
[2] K.W. and C.W. also set forth a claim against Belle Bonfils grounded in strict liability. That claim has been dismissed by the trial court.
[3] AIDS is caused by a retrovirus identified as HIV (human immunodeficiency virus), which attacks an individual's immune system and destroys the individual's natural ability to ward off disease. While the subject of considerable debate, the most frequently cited data suggests that twenty to thirty percent of HIV-positive individuals will develop AIDS within five years. See U.S. Department of Health and Human Services, Public Health Service, AIDS: A Public Health Challenge I-1. See also W. Dornette, AIDS and the Law § 1.12 (1987).
[4] The name of the person or organization for whose credit the blood is donatedoften the donor's employer or occasionally a relative.
[5] This information includes the weight, temperature, blood pressure, and hemoglobin of the donor, as well as the answers checked by the donor in the questionnaire portion of the card concerning medical history and whether the donor had ever been deferred from donating. The comments of the blood center interviewer are also written on the cards, along with the donor's sex, previous blood group and prior donations.
[6] In the case before us, in response to the motion for a protective order, the trial court made the following oral ruling:

I think I'm going to direct that you disclose the donor card of the suspected contaminated donor without any masking on the donor card to the Plaintiff in this case.
We're going to impose some restrictions, though, upon the use of that information. That information is confidential and is not to be disclosed to any third person.... Only you or an agent of your law firm is to have that information, and you are to keep it strictly confidential among yourselves.
[7] The infected donor's card indicates that he weighed 135 pounds on the day he donated the AIDS-infected blood. What he weighed at the time he made other donations of blood does not appear in the record.
[8] Section 25-4-1404, 11 C.R.S. (1987 Supp.), provides:

Use of reports. (1) The reports required to be submitted by sections 25-4-1402, 25-4-1403, and 25-4-1405(8) and held by the state or local department of health or health care provider or facility, third-party payor, physician, clinic, laboratory, blood bank, or other agency shall be strictly confidential medical information. Such information shall not be released, shared with any agency or institution, or made public, upon subpoena, search warrant, discovery proceedings, or otherwise, except under any of the following circumstances:
(a) Release may be made of medical or epidemiologic information for statistical purposes in a manner such that no individual person can be identified.
(b) Release may be made of medical or epidemiological information to the extent necessary to enforce the provisions of this part 14 and related rules and regulations concerning the treatment, control, and investigation of HIV infection by public health officials.
(c) Release may be made of medical or epidemiological information to medical personnel in a medical emergency to the extent necessary to protect the health or life of the named party.
(2) No officer or employee of the state or local department of health shall be examined in any judicial, executive, legislative, or other proceeding as to the existence or content of any individual's report retained by such department pursuant to this part 14 or as to the existence of the contents of reports received pursuant to sections 25-4-1402 and 25-4-1403 or the results of investigations in section 25-4-1405. This provision shall not apply to individuals who are under restrictive actions pursuant to section 25-4-1406 or XX-X-XXXX.
(Emphasis added.)
[9] Section 25-4-1409(2), 11 C.R.S. (1987 Supp.), provides:

Any physician or other health care provider, any officer or employee of the state department or a local department of health, or any person, firm, or corporation which violates section 25-4-1404 by releasing or making public confidential medical information or by otherwise breaching the confidentiality requirements of said section is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than five hundred dollars nor more than five thousand dollars, or by imprisonment in the county jail for not less than six months nor more than twenty-four months, or by both such fine and imprisonment.
[10] A court order which compels or restricts pretrial discovery constitutes state action that is subject to constitutional limitations. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).
[11] Rasmussen is distinguishable from this case in that the plaintiff sought discovery from a nonparty of the names and addresses of fifty-one blood donors. There was no allegation that the blood service was negligent and the court denied disclosure to prevent a fishing expedition that might adversely affect fifty-one individuals. In this case, the respondents seek information relating to only one individual who has been tested positive for AIDS, and whose blood was supplied to K.W. Moreover, the bloodbank is a party that allegedly was negligent in screening this donor.
[12] "The threat posed by the disclosure of the donors' identities goes far beyond the immediate discomfort occasioned by third party probing into sensitive areas of donors' lives. Disclosure of donor identities in any context involving AIDS could be extremely disruptive and even devastating to the individual donor." Rasmussen v. South Florida Blood Serv., 500 So.2d 533, 537 (Fla.1987). It is not necessary for us to determine whether a donor's interest in privacy has its source either in the United States or Colorado Constitutions. We express no opinion on that question.
[13] Examples of questions that the donor might answer are: whether a sufficient medical history was taken of the donor's past; whether the history that was taken was reflected on the donor's card; whether, and to what extent, the questionnaire portion of the card and the donor's answers to the questions were the subject of discussion at the time of the donation; whether the donor gave the same or different medical history before donating blood in the past; why he had been deferred as a blood donor in the past; why he gave the four disqualifying responses; why the word "O.K." was inscribed over the four disqualifying responses; whether his deferral was discussed; whether the venereal disease he contracted was a topic of discussion; whether the questions asked of the donor were the same on March 13, 1985, as they had been in the past; whether the dangers involved in donating HIV-positive blood were discussed; and whether at any point during the interview the interviewer recommended that the donor not give blood.
[14] In their motion to compel discovery, K.W. and C.W. claim:

It is necessary and crucial in this case for plaintiffs to have the opportunity to similarly depose the blood donors for knowledge pertaining to defendant Bonfils' compliance with necessary questioning procedures and the standards within the industry at the time the blood was taken.
[1] Although no issue is raised in this proceeding regarding Belle Bonfils' voluntary disclosure of the sex of the blood donor who tested positive for HIV antibodies, section 25-4-1404(1), 11 C.R.S. (1987 Supp.), includes sex within the information vested with confidentiality.
[2] The AIDS epidemic has spread across the United States. Reports show that in this country there have been over 70,000 cases of AIDS and 40,989 deaths associated with this disease. Center for Disease Control, AIDS Weekly Surveillance Report 5 (Sept. 5, 1988). AIDS, or acquired immune deficiency syndrome, is actually made up of three stages. In the early stage of the disease the virus is called the Human Immunodeficiency Virus (HIV). During this stage, the infected person's condition may be asymptomatic. Following this asymptomatic state is a condition called AIDS-Related Complex. During this stage, the infected person may develop non-lifethreatening conditions, including fever, weight loss, and lymph node enlargement. Finally, AIDS, the full-blown manifestation of infection with HIV virus, causes a weakening of the immune system and the onset of fatal infections. It should be noted, however, that it is presently unknown what proportion of persons infected with HIV will develop AIDS-Related Complex or AIDS.

A 1987 government estimate showed that 12,000 Americans may have been infected with the AIDS virus by blood transfusions as of the end of 1986. Human Immunodeficiency Virus Infection in Transfusion Recipients and Their Family Members, 257 J.Am.Med.Ass'n 1860, 1861 (1987). During the early 1980s various hypotheses were proposed regarding the cause of AIDS, but it was not until 1984 that the virus that apparently causes the disease was isolated. A blood test was subsequently developed to identify infected persons. The blood test, however, could not detect all infected blood because the test is calculated to detect antibodies rather than the virus itself.
[3] C.R.C.P. 31(a) provides that within twenty days after notice and written questions are served, a party may serve cross questions; within ten days thereafter, redirect questions may be served, and then recross questions within ten days following its service of redirect questions.
[4] C.R.C.P. 31(b) states:

A copy of the notice and copies of all questions served shall be delivered by the party taking the deposition to the officer designated in the notice, who shall proceed promptly, in the manner provided by Rule 30(c), (e), and (f), to take the testimony of the witness in response to the questions and to prepare, certify, and file or mail the deposition, attaching thereto the copy of the notice and the questions received by him.
[5] The social stigma attached to persons infected with AIDS has continued to grow despite research which has eliminated various hypotheses on how the virus is spread. The general public has reacted to the disease with hysteria, and AIDS victims have been subjected to social censure, embarrassment, and discrimination in jobs, education, and housing. See Law, Social Policy, and Contagious Disease: A Symposium on Acquired Immune Deficiency Syndrome (AIDS), 14 Hofstra L.Rev. 1 (1985).